## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 14-CR-0110-CVE** |
| | ) | |
| **JESUS JONATHAN CAMPOS-BRETADO,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Before the Court are the motion to suppress statement, Dkt. #17, and the motion to suppress evidence, Dkt. # 18, filed by defendant Jesus Jonathan Campos-Bretado. Defendant argues that his statements should be suppressed because they were involuntary under the Fifth Amendment. Additionally, defendant claims that a warning under <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), was required but not given, and for that reason he asserts that his statements should be suppressed. Defendant also claims that the search of his home was without either a warrant or valid consent and, as a result, all evidence obtained from the search should be suppressed. The government responds that a <u>Miranda</u> warning was not required because defendant was not in custody for Fourth Amendment purposes and that defendant validly consented to the search of his home. Dkt. # 27. The Court held an evidentiary hearing on September 4, 2014, at which four law enforcement officers testified. The Court requested and received supplementary briefing from both parties. Dkt. ## 29, 30.

**I.**

On July 9, 2014, a grand jury returned an indictment charging defendant with possession of methamphetamine with intent to distribute and forfeiture. Dkt. # 4. The indictment came after a search of defendant's vehicle and residence. Officers found no incriminating evidence in the vehicle, but during the search of the vehicle defendant made statements that his home contained contraband. At the residence, officers discovered 877.76 grams (approximately 1.94 pounds) of methamphetamine, as well as $26,114 in cash, drug scales, and two notebooks containing drug notations. The testimony of the four witnesses at the evidentiary hearing is summarized as follows:

<u>Edwin Weilert</u>

Edwin Weilert is a state trooper with the Oklahoma Highway Patrol (OHP) who was patrolling Interstate 244 in Tulsa, Oklahoma on April 15, 2014. Trooper Weilert testified that, at approximately 6:20 p.m., a man in an unmarked car attracted his attention. The man, not in uniform, showed him the credentials of a Tulsa Police Department (TPD) officer and asked him to stop a vehicle traveling on the interstate. The officer described the vehicle, a green Toyota pickup truck, and provided the driver's failure to wear a seat belt as a basis for the stop . Trooper Weilert turned on his lights to stop the vehicle, which pulled over not to the shoulder but instead to a striped v-shaped area between an exit ramp and the highway. The trooper approached the driver, who was the defendant, and spoke to him in English. He confirmed that defendant was not wearing a seat belt, and when he asked for identification defendant gave him a Mexican driver's license. The trooper told defendant to stay in the vehicle while the trooper was writing his citations.

As Trooper Weilert began to return to his car, a uniformed TPD officer approached and asked to have defendant step out of the car. The officer took defendant to stand between the

2

trooper's vehicle and the officer's vehicle, which were also parked in the area between the exit ramp and the highway. Defendant remained with the officer while Trooper Weilert wrote citations for failure to wear a seat belt and driving without a valid license.[1] During the time in which Trooper Weilert was writing the citations, approximately ten minutes, a canine unit arrived on scene. Trooper Weilert observed the dog and handler begin an open-air sniff of the vehicle, but he did not hear the dog alert.[2]

The trooper finished writing the citations and returned to defendant and the uniformed officer. He explained the citations to defendant, including how and where to pay the associated fines. The trooper then told defendant that, without a valid license, he could not drive away once the stop was complete; he would have to call someone to pick him up. Trooper Weilert concluded the conversation by telling defendant "to stay around until these officers were done with him." The trooper then left the scene, without observing other officers arrive.

Jason Roy

Jason Roy is a uniformed officer with the TPD. On April 15, 2014 he responded to a detective's radio call for assistance with a stop, but when he arrived at the location an OHP trooper had already stopped the vehicle. When the trooper began to walk back to his car, Officer Roy approached and said that he wanted to take the driver out of the vehicle in preparation for a dog sniff. Officer Roy then asked defendant, who was still in the vehicle, to step out. The two moved

---

[1]    See OKLA. STAT. tit. 47, §§ 6-303; 12-417 (2013).

[2]    According to statements by plaintiff's counsel, the dog is trained to alert his handler to the presence of narcotics by barking. The dog arrived approximately five minutes after the stop, and it began barking repeatedly approximately two minutes after it began to sniff. Gov't Ex. #1. Defendant did not challenge the alert.

between the trooper's vehicle and the officer's vehicle. Officer Roy saw the trooper give defendant the citations, and Officer Roy received defendant's Mexican driver's license from the trooper.

Officer Roy saw the canine unit arrive, and he knew the handler as TPD Corporal Griffin. He was standing with defendant during the dog sniff, but he did not hear the dog alert. After the trooper left, approximately fifteen minutes after stopping defendant's vehicle, Officer Roy moved defendant to a grassy area on the far side of the exit ramp. While there, Officer Roy made some casual conversation with defendant, including describing the drug dog's actions. He noted that defendant spoke English and did not demonstrate difficulty understanding what was being said.

Approximately five minutes later, TPD Officer Moyer, whom Officer Roy knew and recognized, approached after initially joining the vehicle search. Officer Roy could not recall precisely what Officer Moyer said, but he believed it related to the drug dog's alert and the resulting search. Officer Moyer then moved to rejoin the search; another officer whom Officer Roy knew, TPD Officer Comfort, approached and began to speak with defendant. This was approximately twenty to thirty minutes after the stop began. Officer Comfort told defendant that he believed there were drugs in the vehicle, which defendant denied, and language to the effect of "Now would be the time to cooperate." Officer Comfort repeated the statement regarding drugs several times, and defendant issued a denial each time. Officer Moyer returned and asked defendant whether there were drugs in the vehicle, which defendant again denied, or at defendant's residence, which defendant also denied. Officer Moyer asked if the officers could search defendant's residence, and defendant agreed. Officer Moyer then resumed searching the vehicle while Officer Comfort and Officer Roy remained with defendant.

Officer Roy testified that defendant seemed nervous, watching the officers searching the vehicle and shaking his head. Officer Comfort reiterated his belief that there were drugs in the vehicle and that the officers would find them. Defendant said, "You're going to find it anyway," a statement he repeated several times. Officer Comfort asked if "it" was in the vehicle, and defendant said no, it was in his house. When Officer Comfort asked what was in his house, defendant said that he had two pounds of methamphetamine at his residence.

At that point, Officer Comfort retrieved a <u>Miranda</u> waiver form, allowed defendant to read it, read it aloud to defendant, and then had defendant initial each waiver and sign the form. Officer Roy testified that defendant did not appear to need help reading or understanding the form. Officer Moyer then brought a search waiver form, which defendant read and signed. At the hearing, Officer Roy estimated that the elapsed time between the beginning of the stop and when defendant signed the waivers was eighty to ninety minutes.[3] After defendant signed the waivers, Officer Roy searched him for weapons, placed him in handcuffs, and put him in a vehicle in preparation for transport; the officer did not tell defendant that he was under arrest. Officer Roy transported defendant to defendant's residence and then released him from the handcuffs. Officer Roy was certain that defendant let the officers into the residence and remained uncuffed with Officer Roy while the other officers searched the residence. After the search was complete, Officer Roy again placed defendant in handcuffs and transported him to booking.

---

[3] The time written on each of the waiver forms is 1957 (7:57 p.m.), Gov't Ex. ## 2, 3, and the testimony was that the stop began at approximately 6:20 p.m.

Chad Moyer

On April 15, 2014, TPD Officer Chad Moyer, a sixteen-year veteran then assigned to the Special Investigation Division, received a tip from an informant. According to the tip, a green 1993 Toyota pickup truck would be transporting narcotics from Oklahoma City to Tulsa that day. Officer Moyer put into action a pre-existing plan of apprehension, contacting Officer Comfort and others. While the other officers left the city in an attempt to find the vehicle, Officer Moyer remained behind in position to join pursuit once the vehicle was in Tulsa. When the truck and trailing officers arrived in Tulsa, Officer Moyer contacted a uniformed TPD officer to arrange a stop, but the officer proved unable to assist. Officer Moyer then put out a radio request for assistance and joined the group following the truck. As he was driving, he saw an OHP trooper; he demonstrated his credentials and asked the trooper to stop the vehicle. He told the trooper about traffic infractions that one of the other officers had observed, specifically failure to wear a seat belt.

Officer Moyer, dressed in plain clothes and without a visible weapon, arrived at the scene of the stop fifteen to twenty minutes after it had begun. By that point, the vehicle had been moved from the area between the exit ramp and the highway to the shoulder of the exit ramp. After being told that the drug dog had alerted to the presence of narcotics, Officer Moyer approached defendant, who was standing with Officer Roy. He told defendant about the alert and asked if there was anything he should "worry about" in the vehicle. Following defendant's negative response, he asked if there was "anything at your house that we need to know about," and defendant again said no. To Officer Moyer, defendant spoke English and never signaled difficulty understanding or communicating. After this brief interchange, Officer Moyer joined the search of the vehicle.

After some time, Officer Moyer returned to defendant and Officer Roy, who had now been joined by Officer Comfort. He again asked about illegal drugs in the vehicle and at defendant's home, and defendant again responded in the negative. Officer Moyer then asked defendant if officers could search defendant's residence, and defendant agreed to let them search "if we needed to, if we wanted to." Officer Moyer then resumed the vehicle search, though he watched defendant as he did. After observing physical and behavioral signs of nervousness, including defendant pacing and walking in circles, Officer Moyer returned to the conversation. He heard defendant respond to Officer Comfort's questions by saying "You're going to find it anyways." After asking what officers would find, defendant said that what the officers were searching for was at his house. Specifically, defendant admitted to having two pounds of methamphetamine and approximately fifteen thousand dollars in cash at his house. Officer Moyer testified that, though he could not recall the exact conversation or phrasing, at some point Officer Comfort told defendant something similar to the following: "Hey, if you want to help yourself out or if you want to ... make it where you can assist us possibly at a later time, you know, we need you to be honest."

After hearing defendant admit to the drugs at his residence, Officer Moyer retrieved a search waiver while Officer Comfort gave a <u>Miranda</u> warning. Officer Moyer explained the search waiver form to defendant, telling defendant that department policy required he ask defendant to sign the waiver. He told defendant that, because defendant had given verbal consent to the officers twice already, signing the waiver was not necessary for a search; it was simply a confirmation of the earlier consent statements. Defendant asked no questions before signing the form. Officer Moyer could not remember whether the <u>Miranda</u> waiver or search waiver was signed first, but he testified that both were signed at the same time. Officer Moyer stated that the time listed on the search waiver

form was accurate, and based on that time approximately ninety minutes elapsed between the beginning of the stop and the signing of the waiver. It had been approximately seventy minutes since the beginning of the vehicle search. Following the signing of the waivers, the officers and defendant moved to defendant's residence. Officer Moyer testified that he, not defendant, unlocked defendant's residence to allow the officers entry using keys he had taken from inside the vehicle.

Brian Comfort

TPD Officer Brian Comfort, who has twenty-eight years experience with the department, first became involved in this case when Officer Moyer informed him about a tip that the latter had received. Officer Moyer gave Officer Comfort a description of a vehicle and a license plate number; Officer Comfort, with a few other officers, left Tulsa for a point between Tulsa and Oklahoma City to wait. After some time, the officers spotted a vehicle matching the description in the tip, and they followed it into Tulsa. Officer Comfort testified that he arrived at the scene of the stop twenty-five or thirty minutes after it had begun. He was not in uniform, and his gun was not visible.

Once at the scene of the stop, he joined defendant and Officer Roy in a grassy area beside the highway. Officer Comfort explained the dog alert and subsequent search to defendant. He then told defendant "that there was narcotics in there, and that, you know, 'If you want to cooperate, now's the time to do it.'" After defendant denied having any drugs, Officer Comfort then made idle conversation with defendant, asking about topics like the weather and defendant's family in Mexico. Defendant spoke English with Officer Comfort, without apparent difficulty understanding what the officer was saying. Officer Comfort noticed that defendant looked almost exclusively at the officers conducting the search of the vehicle, even when Officer Comfort asked him questions. Based on his

training and experience, Officer Comfort believed this behavior indicated that there was an illegal substance in the truck.

The discussion between the two was sporadic, lapsing into silence for periods of time. Some time after the initial burst of conversation, Officer Moyer approached and asked defendant about illegal drugs in the vehicle and in defendant's home. Officer Comfort heard defendant deny having drugs, and he heard defendant give permission to search his residence. After Officer Comfort repeated that the officers would find the drugs and that defendant should cooperate now, defendant turned to Officer Roy and asked to speak to him. Officer Comfort told defendant that anything defendant said to Officer Roy would be repeated to him. At that point, defendant said "Well, you're going to find it anyway, aren't you?" Officer Comfort replied, "Yes, we're going to find it anyway." Defendant began moving around and grimacing, and he repeated his previous statement several times. Eventually, defendant said that what the officers were looking for was at his house. Officer Comfort asked what was at the house but received no response. When questioned further, defendant denied having cocaine but admitted having two pounds of methamphetamine at his house.

Officer Comfort then retrieved a <u>Miranda</u> waiver form and read it aloud to defendant. Defendant told the officer that he could read English. Officer Comfort had defendant read the form and then initial and sign to show that he understood and waived each right. Officer Comfort stated that there was approximately one hour between when he arrived and when defendant signed the waivers. After Officer Moyer received the signed search waiver, Officer Comfort asked defendant what the officers would find at defendant's residence, specifically asking about firearms, scales, and money. Defendant denied having a firearm, but said officers would find scales and approximately fifteen thousand dollars. Officer Comfort testified that defendant said the money came from drug

sales. The officers and defendant then proceeded to defendant's residence to begin that search; he could not remember who opened the house, except that he did not do so.

## II.

"Suppression of evidence is an appropriate remedy only when the search violates a person's constitutional rights." United States v. Gama-Bastidas, 142 F.3d 1233, 1238 (10th Cir. 1998). The purpose of a suppression hearing is "to determine preliminarily the admissibility of certain evidence allegedly obtained in violation of defendant's rights under the Fourth and Fifth Amendments." United States v. Merritt, 695 F.2d 1263, 1269 (10th Cir. 1982). "The proponent of a motion to suppress has 'the burden of adducing facts at the suppression hearing indicating that his own rights were violated by the challenged search.'" Gama-Bastidas, 142 F.3d at 1238.

## III.

Defendant argues that all of the statements made during the vehicle search were involuntary under the Fifth Amendment. Moreover, he contends that the officers should have informed him of his rights under Miranda and that their failure to do so should result in suppression of all statements made prior to the warning. He argues that his post-Miranda statements should also be suppressed as having been tainted by a pre-existing illegality that was not cured. The government responds that, based on the totality of the circumstances, defendant's statements were voluntary and that defendant's detention did not rise to the level of custody for purposes of Miranda, making the warning unnecessary. The government argues that, without a pre-existing constitutional violation, the statements made after defendant waived his Miranda rights should not be suppressed. The Court will address each of these issues in turn.

A. Involuntary Statements

Defendant argues that all of his statements to the officers should be suppressed because they were involuntary under the Fifth Amendment. Statements gained involuntarily, by overbearing a defendant's will or as the product of coercion, violate the Fifth Amendment right against self-incrimination, as well as the Due Process Clauses of the Fifth and Fourteenth Amendments. Arizona v. Fulminante, 499 U.S. 279, 285 (1991); United States v. Perdue, 8 F.3d 1455, 1466 (10th Cir. 1993). Such statements cannot be introduced at trial, United States v. Cash, 733 F.3d 1264, 1280 (10th Cir. 2013) (citing Fulminante, 499 U.S. at 287-88), and the government bears the burden of proving by a preponderance of the evidence that a statement was voluntary. Lego v. Twomey, 404 U.S. 477, 489 (1972). Voluntariness is determined under the totality of the circumstances, with a variety of factors under consideration. Perdue, 8 F.3d at 1466 (citing Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973)). The Supreme Court has required lower courts first to find "coercive police activity" before they can rule a statement involuntary. Colorado v. Connelly, 479 U.S. 157, 167 (1986). Beyond that predicate, courts have looked to "(1) the age, intelligence, and education of the defendant; (2) the length of detention; (3) the length and nature of the questioning; (4) whether the defendant was advised of his constitutional rights; and (5) whether the defendant was subject to physical punishment." United States v. Lopez, 437 F.3d 1059, 1063-64 (10th Cir. 2006).

The Connelly requirement of "coercive police activity" bars any finding of involuntariness in this case. Such coercive activity has been found where an officer promised protection from physical violence, Fulminante, 499 U.S. at 288, and where officers use force while questioning a suspect. Perdue, 8 F.3d at 1467. Coercion may exist where officers "overreach by exploiting a weakness or condition known to exist." United States v. Guerro, 983 F.2d 1001, 1004 (10th Cir.

1993). A promise of leniency that is more than a "limited assurance" by the officer can also render a statement coerced. See United States v. Lopez, 437 F.3d 1059, 1065 (10th Cir. 2006); Clanton v. Cooper, 129 F.3d 1147, 1159 (10th Cir. 1997) (collecting cases). By contrast, no coercion existed where a defendant's mother encouraged a defendant to speak to officers alone in an interrogation room, United States v. Erving L., 147 F.3d 1240, 1251 (10th Cir. 1998), or where a defendant made a statement while arrested and handcuffed. United States v. Silva-Arzeta, 602 F.3d 1208, 1215 (10th Cir. 2010).

The Court finds no coercive police activity here, although the officers' behavior was far from perfect. Officer Comfort repeatedly told defendant that he knew the vehicle held illegal drugs, and both Officer Comfort and Officer Moyer asked about illegal items without giving defendant a Miranda warning. Officer Comfort also repeatedly told defendant that he should cooperate before the officers found the drugs, though he did not make specific statements about the consequences of cooperation. These questions and statements do not--quite--rise to the level of threats and promises that constitute coercion under the Fifth Amendment. Moreover, the officers did not raise their voices, draw their weapons, or place defendant in handcuffs, and there is no evidence that they knew of any weakness or condition that might have made defendant more susceptible to coercion. As the officers' behavior was not "coercive police activity," Connelly precludes the Court from finding defendant's statements involuntary.

B. Suppression of Pre-Miranda Statements

The Fifth Amendment privilege against self-incrimination includes the requirement that a defendant be made aware of the right to remain silent and to an attorney prior to police interrogation. Miranda v. Arizona, 384 U.S. 436, 444-45 (1966). However, "[i]t is well established that 'police

officers are not required to administer *Miranda* warnings to everyone whom they question.'" <u>United States v. Erving L.</u>, 147 F.3d 1240, 1246 (10th Cir. 1998) (quoting <u>Oregon v. Mathiason</u>, 429 U.S. 492, 495 (1977)). Under <u>Miranda</u>, the government is barred from using at trial only those statements born of custodial interrogation and made prior to the defendant being given a <u>Miranda</u> warning, unless defendant waived those rights. <u>Miranda</u>, 384 U.S. at 444. Thus, a warning is required only when a two-part test is met: "(1) the individual must be in custody, and (2) the individual must be subjected to questioning that meets the legal definition of interrogation." <u>United States v. Revels</u>, 510 F.3d 1269, 1273 (10th Cir. 2007) (citing <u>United States v. Perdue</u>, 8 F.3d 1455, 1463 (10th Cir. 1993)).

The initial question, then, is whether defendant was in police custody when he spoke to Officers Comfort and Moyer. A person is "in custody" when "a reasonable man in the suspect's position would have understood his situation ... as the functional equivalent of formal arrest." <u>Revels</u>, 510 F.3d at 1273 (citing <u>Berkemer v. McCarty</u>, 468 U.S. 420, 442 (1984)). "Whether a suspect is in custody represents an objective determination." <u>United States v. Jones</u>, 523 F.3d 1235, 1239 (10th Cir. 2008). Courts must "ignore the subjective views of interrogating officers" and instead look to "(1) whether the circumstances demonstrated a police-dominated atmosphere; (2) whether the nature and length of the officers' questioning was accusatory or coercive; and (3) whether the police made [defendant] aware that [he] was free to refrain from answering questions, or to otherwise end the interview." <u>Revels</u>, 510 F.3d at 1275. The Supreme Court has stated that the "noncoercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not 'in custody' for the purposes of Miranda." <u>Berkemer</u>, 468 U.S. at 440. However, "when a given traffic stop becomes more coercive than a routine traffic stop, police may

well be required to advise a suspect of his *Miranda* rights even though the underlying seizure of the individual might qualify as a reasonable investigative detention under the Fourth Amendment." Revels, 510 F.3d at 1273-74.

The Court finds that, based on the totality of the circumstances, defendant was in custody for Miranda purposes prior to making any incriminating statements. With respect to the first factor, the atmosphere was not impermissibly police-dominated, such that it resembled an arrest more than a traffic stop or consensual encounter. Defendant was asked to step out of his car and remained with at least one, and up to three, officers for the duration of the encounter. Two officers questioned him, while others searched his vehicle. The "threatening presence of several officers" counsels in favor of finding a police-dominated atmosphere. United States v. Griffin, 7 F.3d 1512, 1519 (10th Cir. 1993). However, defendant was never isolated in a non-public place, the officers never drew their weapons, most of the officers near defendant were not in uniform and did not have visible weapons, and defendant was not physically touched by an officer until Officer Roy searched him prior to transporting him to the residence. See Griffin, 7 F.3d at 1519.

The second and third factors both weigh heavily in favor of finding defendant in custody long before he made his statements. Defendant was held by the side of the road for more than an hour and a half, and during that time he faced repeated and accusatory questioning from multiple officers. Officer Comfort repeatedly told defendant that they would find drugs in the truck and encouraged him to cooperate before it was too late. Officer Moyer asked directly about illegal drugs not only in the truck but also at defendant's residence. Likewise, the officers never made clear to defendant that he could refuse to answer their questions or that he could leave. In fact, the situation was just the opposite: Trooper Weilert had instructed defendant "to stay around until these officers

were done with him." He also told defendant that defendant would need to call someone to drive him home, but there is no evidence that defendant had a cell phone or other means of securing transportation. The Court finds that Officer Moyer's testimony about his possession and use of defendant's keys to unlock the residence is credible. It follows, then, that even if defendant had felt able to leave, he could not have entered his own residence. Based on these facts, a reasonable person in defendant's situation would have considered himself under the functional equivalent of a formal arrest and, thus, in custody.

Even if defendant was in custody, a <u>Miranda</u> warning was not needed unless the officers also interrogated him. Interrogation "refers not only to express questioning but also any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." <u>Rhode Island v. Innis</u>, 446 U.S. 291, 301 (1980). Questions about a person's name or address are not considered interrogation. <u>United States v. Lara-Garcia</u>, 478 F.3d 1231, 1235 n.3 (10th Cir. 2007). Neither is an officer's response to a defendant's questions, <u>United States v. Cash</u>, 733 F.3d 1264, 1278 (10th Cir. 2013), nor a statement volunteered by a defendant without an officer's prompting. <u>United States v. Gay</u>, 774 F.2d 368, 379 (10th Cir. 1985). However, Officer Comfort's and Moyer's actions are just the type of express questioning that concerned the Supreme Court in <u>Innis</u>. Although some of their questions, including the location of defendant's residence, would not trigger <u>Miranda</u>, their repeated accusatory questions about the presence and location of illegal narcotics would. As defendant meets both the custody and interrogation requirements, he should have received a <u>Miranda</u> warning prior to his statements about possession of drugs at his house. All incriminating statements made prior to the officers informing defendant of his <u>Miranda</u> rights should be suppressed.

C. Post-Miranda Statements

The protections that the Fifth Amendment gives to statements made during custodial interrogation can be greatly reduced once a defendant receives a <u>Miranda</u> warning, absent specific circumstances. Rulings in these situations are generally governed by the Supreme Court's holdings in <u>Missouri v. Seibert</u>, 542 U.S. 600 (2004), and <u>Oregon v. Elstad</u>, 470 U.S. 298 (1985). The general rule, as set down in <u>Elstad</u>, is that statements made voluntarily after a warning are admissible. <u>Elstad</u>, 470 U.S. at 314. However, in <u>Seibert</u> a plurality of the Court found that a <u>Miranda</u> warning given in the midst of an interrogation did not necessarily render a defendant's post-warning statements admissible. <u>Seibert</u>, 542 U.S. at 604 (plurality opinion). As discussed above, defendant was being interrogated and was in custody when he made his initial and subsequent statements, meaning the Court must follow the <u>Seibert</u> analysis rather than relying solely on <u>Elstad</u>.

The holding of <u>Seibert</u> is unfortunately fragmented. The plurality focused on five factors that courts should look to when police use the two-step interrogation tactic:

> [T]he completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogators questions treated the second round as continuous with the first.

<u>Id.</u> at 615. Justice Kennedy concurred in the judgment, but he found the plurality's test too broad. <u>Id.</u> at 622 (Kennedy, J., concurring in the judgment). Instead, courts should continue to follow <u>Elstad</u> unless the two-step interrogation "was used in a calculated way to undermine the <u>Miranda</u> warning." <u>Id.</u> If so, "postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made." <u>Id.</u>

In the only published decision on the issue, the Tenth Circuit applied both tests to the same conclusion, noting that there were strong difficulties with applying just one or the other. United States v. Carrizales-Toledo, 454 F.3d 1142, 1151-53 (10th Cir. 2006). The Court will apply both tests because, as in Carrizales-Toledo, the result is the same.[4] Most of the factors of the plurality's test favor finding defendant's post-Miranda statements inadmissible. The level of detail in the questions and answers did differ before and after defendant's Miranda warning, a note in favor of admission. However, the content of the statements overlapped, as both concerned defendant possessing drugs in certain quantities at his home. The timing and setting of the two statements were identical, and Officers Comfort, Moyer, and Roy were present for all of the statements. Because Officer Comfort's questions after the Miranda warning were designed simply to provide further details about defendant's pre-Miranda statements, it is clear that he believed the second round of statements was a continuation of the first. Under the Seibert plurality's formulation, then, defendant's post-Miranda statements are inadmissible.

The same is true following Justice Kennedy's analysis. Defendant's case does not represent the type of accidental or unintentional two-step interrogation that Justice Kennedy felt better handled under Elstad. See Carrizales-Toledo, 454 F.3d at 1152-53 (finding no evidence that agent intentionally failed to give a warning where defendant confessed while in car during traffic stop).

---

[4]    In his concurrence in an unpublished per curiam opinion, one Tenth Circuit judge found Justice Kennedy's narrower test to be the holding of Seibert. United States v. Sanchez-Gallegos, 412 F. App'x 58, 72 (10th Cir. Jan. 4, 2011) (Holmes, J., concurring) (unpublished and cited for persuasive value only). A majority of other circuits also follow Justice Kennedy's analysis alone. See United States v. Mashburn, 406 F.3d 303, 309 (4th Cir. 2005); United States v. Kiam, 432 F.3d 524, 532-33 (3d Cir. 2006); United States v. Street, 472 F.3d 1298, 1313 (11th Cir. 2006); United States. v. Nunez-Sanchez, 478 F.3d 663, 668 n.1 (5th Cir. 2007); United States v. Carter, 489 F.3d 528, 535 (2d Cir. 2010); United States v. Thomas, 664 F.3d 217, 223 (8th Cir. 2011).

Officer Comfort's initial contact with defendant was to tell defendant that the officers would find drugs and that he should cooperate while there was still time to do so. He repeatedly told defendant to cooperate, and when defendant began exhibiting signs of extreme nervousness Officer Comfort urged him to make a statement rather than providing him with the warning. There is no evidence that the officers allowed for a "substantial break in time and circumstances," "an additional warning ... exlain[ing] the likely inadmissibility of the precustodial statement," or any other curative measure. Seibert, 542 U.S. at 622 (Kennedy, J., concurring in the judgment). Thus, defendant's statements are also inadmissible under Justice Kennedy's test. As both results are the same, the Court finds that defendant's post-warning statements are inadmissible under Seibert and must be suppressed.

## IV.

Defendant argues that all of the evidence seized at his home should be suppressed because the officers lacked a warrant to search the residence or an exception to the warrant requirement. He claims that any consent was not voluntary or, in the alternative, that it was tainted by other constitutional violations. The government responds that defendant gave the officers valid consent to search the house several times, both before and after defendant was informed of his Miranda rights. The Fourth Amendment protects the "right of the people to be secure in their ... houses ... against unreasonable searches and seizures" by requiring police to seek a warrant based on probable cause. U.S. CONST. amend. IV. Courts have developed a number of exceptions to the warrant requirement, including a defendant's voluntary consent to the search or seizure. Schneckloth, 412 U.S. at 219. Without a warrant or valid exception, evidence gathered from a search of a home offends the Fourth Amendment and cannot be used at trial. Wong Sun v. United States, 371 U.S. 471, 484 (1963); Mapp v. Ohio, 367 U.S. 643, 655 (1961). The government bears the burden of

proving any exception to the warrant requirement, United States v. Maestas, 2 F.3d 1485, 1491 (10th Cir. 1993), and it must prove that any consent was "freely and voluntarily given." United States v. Sandoval, 29 F.3d 537, 539 (10th Cir. 1994). "The standard of 'voluntariness' for consent to waive Fourth Amendment rights differs from the standard of 'voluntariness for consent to waive Fifth Amendment rights." United States v. Carson, 793 F.2d 1141, 1150 (10th Cir. 1986). Thus, the Court's ruling that defendant's statements were voluntary under the Fifth Amendment has no effect here. Defendant provided the officers with apparent consent three times during the interchange: once verbally prior to his statements about drugs and prior to the Miranda warning; once verbally after his statements about drugs but prior to the Miranda warning; and once in writing at the same time as the Miranda warning when defendant signed a search waiver form.

As a preliminary matter, the Court notes that administration of a warning, or the lack thereof, is not relevant to the analysis of consent because "physical evidence that is the fruit of a voluntary statement should not be suppressed even if the statement was elicited without a *Miranda* warning." United States v. Phillips, 468 F.3d 1264, 1266 (10th Cir. 2006) (citing United States v. Patane, 542 U.S. 630, 634 (2004) (plurality opinion)). The defendant in Patane, "in response to custodial questioning without a Miranda warning, disclosed the gun's location and gave the officers permission to retrieve it." Phillips, 468 F.3d at 1266. The officers in that case did not seek a search warrant before seizing the weapon, yet the Supreme Court upheld its admission at trial. Patane, 542 U.S. at 635, 644. Thus, the Court need only look to whether any of the consent statements was voluntary, without regard to when defendant received Miranda warnings.

Voluntariness for a consent to search requires a two-step analysis, where "the government must (1) 'proffer clear and positive testimony that consent was unequivocal and specific and freely

and intelligently given' and (2) 'prove that this consent was given without implied or express duress or coercion.'" United States v. Sanchez, 89 F.3d 715, 719 (10th Cir. 1996) (quoting United States v. McRae, 81 F.3d 1528, 1537 (10th Cir. 1996)). The Tenth Circuit uses a totality of the circumstances approach to questions of consent to search a home. United States v. Sawyer, 441 F.3d 890, 895 (10th Cir. 2006). A long list of factors can be considered, including:

> ... [P]hysical mistreatment, use of violence, threats, promises, inducements, deception, trickery, or an aggressive tone, the physical and mental condition and capacity of the defendant, the number of officers on the scene, and the display of police weapons. Whether an officer reads a defendant his *Miranda* rights, obtains consent pursuant to a claim of lawful authority, or informs a defendant of his or her right to refuse consent also are factors to consider in determining whether consent given was voluntary under the totality of the circumstances.

Id. (citations omitted). "A signed consent form is indicative of a voluntary consent," but like the other factors it is not dispositive. Eidson v. Owens, 515 F.3d 1139, 1147 (10th Cir. 2008).

The facts of this case do not lend themselves to an easy answer, though several cases are instructive. In United States v. Silva-Arzeta, 602 F.3d 1208, 1211 (10th Cir. 2010), an officer conducting surveillance of one apartment saw activity consistent with drug sales taking place at another apartment. The officer had Silva-Arzeta, whom he saw securing the apartment, stopped for a traffic violation. Id. Silva-Arzeta was handcuffed after officers found he was driving without a license. Id. A search of the car revealed a small quantity of methamphetamine. Id. After receiving a Miranda warning, Silva-Arzeta admitted the drugs belonged to him and gave consent for a search of his apartment, though he denied there were any drugs there. Id. at 1211-12. The apartment search yielded more methamphetamine, a gun, and other items related to drug sales. Id. at 1212. The district court found Silva-Arzeta's consent voluntary, despite his being handcuffed and questioned by several officers. Id. at 1214. The circuit court affirmed, noting that Silva-Arzeta was asked to

consent in a public place and that the officers never drew their weapons, used an aggressive tone, or said that Mr. Silva-Arzeta was required to give consent to the search. Id. at 1214-15.

In contrast, the Tenth Circuit panel in Eidson found the Eidsons' consent involuntary. The situation there began when the Eidsons' lawyer, who also served as a reserve deputy sheriff, approached Mrs. Eidson in her driveway about a recent altercation. Eidson, 515 F.3d at 1143. While he was there, other officers appeared after receiving a tip that the Eidsons were growing marijuana in their backyard. Id. The other officers informed the lawyer/deputy, within earshot of Mrs. Eidson, that the tip had come from the Eidsons' son, though it had not. Id. The deputy returned to Mrs. Eidson and repeated what the other officer had told him, after which Mrs. Eidson confessed to having marijuana plants in the yard. Id. The deputy asked them for consent to search the property. Id. When Mr. Eidson asked what would happen if they did not consent to a search, the deputy informed them that the officers would hold them for as long as it took to obtain a warrant, up to three days. Id. The deputy also told them that the judge would be harder on them if they were uncooperative, after which both Eidsons signed consent forms. Id. at 1143-44. There were some non-coercive factors involved, including the signed waiver forms and the fact that none of the officers "acted aggressively, unholstered their sidearms, or physically mistreated the Eidsons." Id. at 1147. However, the appellate court found that several coercive factors rendered the consents invalid in spite of these non-coercive factors. Specifically, the court pointed to fact that the deputy had previously been the Eidson's lawyer, the deputy's threat of detention, and the statement of a judicial penalty for refusing to consent. Id. at 1147-48.

Based on this authority and the testimony presented at the suppression hearing, the Court finds that none of defendant's statements of consent was voluntary. There were a significant number

of coercive factors indicating the first two statements were involuntary: the large number of officers at the scene; the aggressive questioning by Officers Moyer and Comfort; Officer Comfort's statement that defendant should cooperate before drugs were found, implying that cooperation would not be possible afterwards; the fact that no officer informed defendant of his right to refuse to consent to a search; and the absence of a Miranda warning. All of these factors were present before Officer Moyer first asked defendant to consent, and they remained present when defendant gave his second verbal consent. A number of non-coercive factors were also present: defendant was never subjected to violence or physical mistreatment; officers never displayed weapons; the officers never made outright threats or promises to defendant, nor did they use deception or trickery to gain his consent; defendant was in a public place; and there was no evidence defendant had a mental or physical weakness making him more susceptible to coercion. However, based on Tenth Circuit precedent, the coercive elements are greater. Although it lacked the prior attorney element, defendant's situation seems more analogous to that of the defendants in Eidson than to the defendant in Silva-Arzeta, particularly with regard to the implication regarding cooperation and the officers' failure to inform defendant of either his Miranda rights or his right to refuse to consent.

The written search waiver also did not suffice to give the officers voluntary consent. Many of the non-coercive and coercive factors listed above apply to defendant's final consent as well. However, there was a new non-coercive factor: when defendant signed the search waiver he had been read his Miranda rights, and none of the evidence presented at the suppression hearing demonstrated that he did not understand those rights. But counterbalancing–and indeed outweighing–that new non-coercive factor is Officer Moyer's statement to defendant that defendant had already given his consent and the form was to memorialize that. For all practical purposes, this

statement was a claim of lawful authority to search that Officer Moyer used to obtain defendant's signature on the waiver form. See Sawyer, 441 F.3d at 895 (citing Bumper v. North Carolina, 391 U.S. 543, 548-49 (1968)). Such a statement seems highly coercive, especially in conjunction with the other coercive factors that remained present when defendant signed the waiver form. Under the totality of the circumstances, none of defendant's statements of consent was voluntary. As a result, the government's search of defendant's house without a warrant was illegal, and the evidence obtained from it must be suppressed.

## CONCLUSION

**IT IS THEREFORE ORDERED** that defendant Jesus Jonathan Campos-Bretado's motion to suppress statement (Dkt. # 17) and motion to suppress evidence (Dkt. # 18) are **granted**.

**DATED** this 10th day of September, 2014.

_____
CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE